UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

BRIAN KIDNEY, JESSICA CLAYCOMB, DENISE CRISCELLA, and CAITLYN MACNEILL-FISCHER, on behalf of themselves, individually, and on behalf of all others similarly-situated,

Plaintiffs,

-against-

KITCHENSYNC, LLC,

Defendant.

-----------------------------------------------------------------X

Civil Case No.: 26-cv-3093

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**CLASS AND COLLECTIVE ACTION**

Plaintiffs BRIAN KIDNEY, JESSICA CLAYCOMB, DENISE CRISCELLA, and CAITLYN MACNEILL-FISCHER, on behalf of themselves, individually, and on behalf of all others similarly-situated ("FLSA Plaintiffs" and/or "Rule 23 Plaintiffs"), (collectively, "Plaintiffs"), by and through their attorneys, STEVENSON MARINO LLP, as and for their Complaint against KITCHENSYNC, LLC ("Defendant"), allege upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. Plaintiffs bring this action for Defendant's violations of: (i) the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207, 216(b); (ii) the FLSA's requirement to make prompt payment of wages, 29 U.S.C. § 201 *et seq.*; (iii) the overtime provisions of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*; (iv) the prohibition against unlawful deductions under the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*; (v) the requirement that employers furnish employees with accurate wage notices

upon hire under NYLL § 195(1); (vi) the requirement that employers furnish employees with accurate wage statements on each payday containing specific categories of accurate information under NYLL § 195(3); (vii) the prohibition against unlawful deductions under NYLL § 193; (viii) the timely payment of wages provisions under the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1 *et seq*.; (ix) breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104; (x) failure to make plan contributions in violation of ERISA, 29 U.S.C. § 1132; (xi) the prohibition against filing fraudulent information returns under the Internal Revenue Code, 26 U.S.C. § 7434(a); (xii) the anti-retaliation provisions of the NYLL's whistleblower protection law, NYLL § 740; and (xiii) any other cause(s) of action that can be inferred from the facts set forth herein.

## PRELIMINARY STATEMENT

2. Defendant KitchenSync, LLC operates as a back-of-house services agency for restaurants, providing human resources, payroll, bookkeeping, and accounts payable services to approximately 80-100 restaurant clients. Despite managing financial and human resources operations for dozens of businesses, Defendant systematically violated federal and state employment laws through a comprehensive pattern of wage and benefits misconduct affecting its entire workforce.

3. Defendant misclassified many of its employees, including Plaintiffs Jessica Claycomb and Denise Criscella, while forcing them to work excessive hours beyond forty each week and failing to pay them any overtime compensation for those hours.

4. Next, beginning in summer 2024 and accelerating throughout 2025, Defendant routinely paid wages late – at least once per month with significant delays beyond scheduled paydays – in violation of the FLSA's prompt payment requirement and various state wage payment

laws. These late payments were compounded by Defendant's resort to alternative payment methods, including Zelle and wire transfers, circumventing traditional payroll systems and proper wage documentation, often resulting in claiming that tax or benefits deductions and withholdings were made, when in reality Defendant pocketed those funds for its own benefit. From April 2025 forward, Defendant ceased providing pay stubs altogether, claiming employees were "being paid via wire transfer, not via payroll," deliberately failing to furnish required wage notices in violation of state wage payment laws.

5. Most egregiously, in May 2025, Defendant cancelled employees' health insurance coverage effective May 31, 2025, without providing notice to affected employees, who discovered the termination only through letters from UnitedHealthcare. Despite cancelling coverage, Defendant continued deducting health insurance premiums from employees' wages through at least June 13, 2025. This breach of fiduciary duty under ERISA affected all U.S.-based employees nationwide, resulting in substantial out-of-pocket medical expenses ranging from hundreds to tens of thousands of dollars.

6. Defendant's ERISA violations extended beyond health insurance to retirement benefits. Despite deducting 401(k) contributions from employees' wages, Defendant failed to remit these contributions to the plan, depriving employees of both their own contributions and promised employer matching contributions.

7. In perhaps the most troubling instance of fraud, Defendant filed fraudulent W-2 information return forms, reporting income and withholdings that did not accurately reflect the contributions that should have been made, violating the Internal Revenue Code, and many states' laws.

8. When Plaintiff Brian Kidney became the first employee to openly complain about Defendant's unlawful cancellation of health insurance and failure to reimburse medical expenses, Defendant retaliated by terminating his employment on July 18, 2025, falsely claiming "budget constraints" despite no other employees losing their positions, in violation of NYLL § 740's whistleblower protection provisions.

9. Given the multi-jurisdictional nature of Defendant's workforce – with employees working remotely in New York, Pennsylvania, New Jersey, and other states – Plaintiffs assert claims under both federal law (FLSA and ERISA) and the employment laws of multiple states where Defendant's conduct caused harm.

10. Plaintiffs bring this lawsuit pursuant to the collective action provisions of the FLSA, 29 U.S.C. § 216(b), on behalf of themselves and all other similarly-situated persons who suffered damages from Defendant's violations of the FLSA's overtime and prompt payment provisions.

11. Plaintiffs also bring this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and all similarly-situated persons who suffered damages from Defendant's violations of ERISA, including breach of fiduciary duty, failure to make plan contributions, and filing of fraudulent information returns under the Internal Revenue Code.

12. Individual Plaintiffs assert their respective state law claims under the wage payment laws of Pennsylvania, New York, and New Jersey, based on their work locations and the applicability of each state's laws to their employment.

13. Accordingly, Plaintiffs bring this action to remedy Defendant's violations of the FLSA, ERISA, Internal Revenue Code, NYLL, Pennsylvania Wage Payment and Collection Law, New Jersey Wage Payment Law, and any other applicable laws.

## JURISDICTION AND VENUE

14. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 29 U.S.C. § 201 *et seq*. and 29 U.S.C. § 1001 *et seq*. The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367 over all non-federal claims arising from a common nucleus of operative facts, such that they form part of the same case or controversy.

15. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as substantial actions comprising the claims for relief occurred within this judicial district, including the employment and location of New York-based Plaintiffs and where substantial harm from Defendant's conduct occurred.

## PARTIES

***Plaintiff Brian Kidney***

16. Plaintiff Kidney is an individual who, at all times relevant to this Complaint, was and is a resident of Staten Island, New York.

17. Plaintiff Kidney was employed by Defendant as a Client Finance Manager from November 2023 to July 18, 2025.

18. At all relevant times herein, Plaintiff Kidney was a "person" and an "employee" of Defendant within the meaning of the FLSA, NYLL, NYCRR, ERISA, the Internal Revenue Code, and asserts claims both individually and as a member of the FLSA collective and Rule 23 class.

***Plaintiff Jessica Claycomb***

19. Plaintiff Claycomb is an individual who, at all times relevant to this Complaint, was and is a resident of North Huntingdon, Pennsylvania.

20. Plaintiff Claycomb was employed by Defendant as an HR & Benefits Administrator servicing Defendant's clients (i.e., not performing any administrative duties for Defendant itself), from March 12, 2020 to November 29, 2024.

21. At all relevant times herein, Plaintiff Claycomb was a "person" and an "employee" of Defendant within the meaning of the FLSA, the Pennsylvania Wage Payment and Collection Law, ERISA, the Internal Revenue Code, and asserts claims as a member of the FLSA collective and Rule 23 class.

***Plaintiff Denise Criscella***

22. Plaintiff Criscella is an individual who, at all times relevant to this Complaint, was and is a resident of Gibsonia, Pennsylvania.

23. Plaintiff Criscella was employed by Defendant until February 24, 2025.

24. At all relevant times herein, Plaintiff Criscella was a "person" and an "employee" of Defendant within the meaning of the FLSA, the Pennsylvania Wage Payment and Collection Law, ERISA, the Internal Revenue Code, and asserts claims as a member of the FLSA collective and Rule 23 class.

***Plaintiff Caitlyn MacNeill-Fischer***

25. Plaintiff MacNeill-Fischer is an individual who, at all times relevant to this Complaint, was and is a resident of Jersey City, New Jersey.

26. Plaintiff MacNeill-Fischer was employed by Defendant as a Customer Service Specialist/AP Specialist from April 28, 2023 to August 2025.

27. At all relevant times herein, Plaintiff MacNeill-Fischer was a "person" and an "employee" of Defendant within the meaning of the FLSA, the New Jersey Wage Payment Law, ERISA, the Internal Revenue Code, and asserts claims as a member of the FLSA collective and Rule 23 class.

***Defendant KitchenSync, LLC***

28. At all relevant times herein, Defendant was and is a California domestic limited liability company with Federal Employer Identification Number 87-0895608 and principal place of business located at 7409 Beverly Blvd, Los Angeles, California 90036.

29. Defendant owns, operates and manages a back-of-house staffing and services agency for restaurants, providing human resources, payroll services, bookkeeping, and accounts payable services to restaurant clients throughout the United States.

30. At all relevant times herein, Defendant employed more than two employees, engaged in interstate commerce within the meaning of the FLSA, and exercised control over the terms and conditions of Plaintiffs' employment, including the power to hire and fire employees, determine rates and methods of pay, determine work schedules, supervise and control employees' work, and affect the quality of employees' work conditions and employment.

31. Accordingly, Defendant was and is a "person" and an "employer" of Plaintiffs within the meaning of the FLSA, NYLL, NYCRR, the Pennsylvania Wage Payment and Collection Law, the New Jersey Wage Payment Law, ERISA, and the Internal Revenue Code.

32. In addition, on August 1, 2025, Plaintiff Brian Kidney, on behalf of himself and all others similarly situated, served a notice on Defendant pursuant to New York Limited Liability Company Law § 609, which serves to hold the ten members of Defendant with the largest

percentage ownership in Defendant's company, personally liable for any unsatisfied / unpaid indebtedness of Defendant as a result of this action.

## COLLECTIVE ACTION ALLEGATIONS

33. Plaintiffs Claycomb and Criscella and MacNeill-Fischer, individually on their own behalf and on behalf of all others similarly situated, seek to bring this suit to recover from Defendant unpaid overtime compensation and damages for untimely payment of wages pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), on behalf of those in the following collective:

> Current and former employees who, during the applicable FLSA limitations period, performed any work for Defendant and were subjected to Defendant's wage practices, and who consent to file a claim to recover damages for: (1) unpaid overtime compensation legally due to them; (2) untimely payment of wages; and/or (3) liquidated damages legally due to them ("FLSA Plaintiffs").

34. Defendant treated Plaintiffs and all FLSA Plaintiffs similarly in that Plaintiffs and all FLSA Plaintiffs: (1) were employed in non-managerial positions; (2) were subject to the same laws and regulations; (3) were paid through the same payroll systems and methods; (4) experienced systematic late wage payments via alternative methods including Zelle and wire transfers; (5) were not provided with proper wage statements; and (6) in applicable cases, worked in excess of forty hours per workweek without receiving required overtime compensation.

35. At all relevant times, Defendant is and has been aware of the requirements to pay Plaintiffs and all FLSA Plaintiffs wages on regular paydays and overtime compensation at one and one-half times their regular rates for hours worked above forty per workweek, yet Defendant purposefully and willfully chose not to do so.

36. The precise number of FLSA Plaintiffs will be ascertained through Defendant's personnel and payroll records during the opt-in notice process.

37. Thus, all FLSA Plaintiffs are victims of Defendant's pervasive practice of willfully failing to pay wages timely and refusing to pay overtime compensation for hours worked above forty per workweek, in violation of the FLSA.

## RULE 23 CLASS ALLEGATIONS

38. In addition, Plaintiffs seek to maintain this action as a class action pursuant to FRCP 23(b)(3), individually, on their own behalf, as well as on behalf of those who are similarly situated who, during the applicable limitations period, were subjected to violations of ERISA and the Internal Revenue Code.

39. Plaintiffs seek certification of the following FRCP 23 classes (collectively, ("Rule 23 Plaintiffs"):

*ERISA Class A*

> Current and former employees who performed any work for Defendant during the statutory period within the United States, and who had 401(k) retirement plan contributions deducted from their wages but not remitted to their retirement accounts and/or did not receive proper employer matching contributions to their 401(k) accounts;

*ERISA Class B*

> Current and former employees who performed any work for Defendant during the statutory period within the United States and were enrolled in Defendant's group health insurance plan and had their coverage cancelled without notice

*IRC Class*

> Current and former employees who performed any work for Defendant during the statutory period within the United States received W-2 forms that listed income, withholdings, or contributions when same were not accurately reported to the IRS and/or their applicable home states.

40. All of the requirements under FRCP 23(b)(3) are satisfied, as set forth below.

41. Moreover, Plaintiffs and the Rule 23 Plaintiffs have all been injured in that they have been uncompensated or under-compensated due to Defendant's common policies, practices, and patterns of conduct. Specifically, Plaintiffs and the Rule 23 Plaintiffs have suffered concrete injuries including: out-of-pocket medical expenses ranging from hundreds to thousands of dollars due to health insurance cancellation; loss of retirement contributions and investment earnings; banking fees charged for alternative payment methods; and tax consequences from fraudulent information returns. Plaintiffs and the Rule 23 Plaintiffs were deprived of the benefits they had enrolled in and paid for, and were harmed by Defendant's breach of its fiduciary duties under ERISA.

Numerosity & Ascertainability

42. During the applicable ERISA and IRC limitations period, Defendant employed at least 40 employees in the United States who are putative members of this class.

43. The precise number of the Rule 23 Plaintiffs is readily ascertainable through a review of Defendant's personnel records, payroll records, benefits enrollment records, health insurance carrier records with UnitedHealthcare, retirement plan records with Empower and prior providers, tax filing records, and banking records reflecting premium deductions and contribution withholdings.

Common Questions of Law and/or Fact

44. There are questions of law and fact common to each Rule 23 Plaintiff that predominate over any questions solely affecting individual members of the FRCP 23 class, including but not limited to the following: (1) whether Defendant maintained an employee benefit plan subject to ERISA; (2) whether Defendant was a fiduciary with respect to the health insurance and retirement plans within the meaning of ERISA; (3) whether Defendant breached its fiduciary

duties by cancelling health insurance coverage without providing notice to plan participants; (4) whether Defendant breached its fiduciary duties by continuing to deduct health insurance premiums after cancelling coverage; (5) whether Defendant failed to remit 401(k) contributions that were deducted from employees' wages to the retirement plan; (6) whether Defendant failed to make employer matching contributions to employees' retirement accounts as promised; (7) whether Defendant failed to implement Health Savings Account programs despite employee enrollment; (8) whether Defendant filed fraudulent W-2 forms reporting inaccurate information regarding retirement plan contributions and withholdings; (9) whether Defendant's actions violated 26 U.S.C. § 7434(a); (10) whether Defendant has any affirmative defenses to any of the Rule 23 Plaintiffs' claims; (11) whether the Defendant's actions with respect to the Rule 23 Plaintiffs were in violation of ERISA and the Internal Revenue Code; and (12) if so, what constitutes the proper measure of damages.

Typicality of Claims and/or Defenses

45. As described in the "Background Facts" section below, Defendant employed Plaintiffs and Rule 23 Plaintiffs within the meaning of ERISA. Plaintiffs' claims are typical of the claims of the Rule 23 Plaintiffs whom they seek to represent, as the Rule 23 Plaintiffs: work and/or have worked for Defendant as employees; enrolled in Defendant's group health insurance plan and/or 401(k) retirement plan; had their health insurance coverage cancelled effective May 31, 2025 without receiving notice; had health insurance premiums continue to be deducted from their wages after coverage was cancelled; had 401(k) contributions deducted from their wages but not remitted to their retirement accounts; did not receive promised employer matching contributions; and/or received fraudulent W-2 forms inaccurately reporting retirement plan contributions and withholdings.

46. Plaintiffs and the Rule 23 Plaintiffs enjoy the same statutory rights under ERISA to have their plan benefits properly administered by fiduciaries acting in their best interests, to have their retirement contributions timely remitted to their accounts, and to be protected from breaches of fiduciary duty. Plaintiffs and the Rule 23 Plaintiffs have all sustained similar types of damages as a result of Defendant's failure to comply with ERISA and the Internal Revenue Code. Plaintiffs and the Rule 23 Plaintiffs all have suffered injury including loss of health insurance coverage, out-of-pocket medical expenses, loss of retirement contributions and investment earnings, and tax consequences from fraudulent information returns, all due to Defendant's common policies, practices, and patterns of conduct. Thus, Plaintiffs' claims and/or Defendant's defenses to those claims are typical of the Rule 23 Plaintiffs' claims and the Defendant's defenses to those claims.

<u>Adequacy</u>

47. Plaintiffs, as described below, were enrolled in the same health insurance and retirement plans as the Rule 23 Plaintiffs throughout their employment with Defendant. Defendant cancelled Plaintiffs' health insurance coverage without notice while continuing to deduct premiums, failed to remit Plaintiffs' 401(k) contributions to their retirement accounts, and failed to provide promised employer matching contributions and Health Savings Account implementation, which is substantially similar to how Defendant treated the Rule 23 Plaintiffs.

48. Plaintiffs fully anticipate providing discovery responses and testifying under oath as to all of the matters raised in this Complaint and that will be raised in Defendant's Answer. Thus, Plaintiffs will properly and adequately represent the current and former employees whom Defendant has subjected to the treatment alleged herein.

49. Additionally, Plaintiffs' counsel has substantial experience in the field of employment law, including extensive experience prosecuting class actions under federal and state

statutes. Plaintiffs' counsel is dedicated to its clients, working diligently to achieve the best outcome for them. Accordingly, Plaintiffs' counsel will fairly and adequately represent the interests of the putative class and will take all steps necessary to obtain class certification and appointment as class counsel.

Superiority

50. A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of class claims, particularly given that the systematic ERISA violations affected the entire workforce through uniform policies of health insurance cancellation and retirement contribution mismanagement.

51. Plaintiffs have no, or very few, material facts relating to the Rule 23 Plaintiffs' claims that are atypical of those of the putative class. Indeed, at all relevant times herein, Defendant treated Plaintiffs identically, or at the very least, substantially similarly, to the Rule 23 Plaintiffs through its company-wide administration of benefits programs.

52. Any lawsuit brought by an employee of Defendant based on the health insurance cancellation or retirement plan contribution failures would be identical to a suit brought by any other employee for the same violations. All class members suffered from the same systematic breaches of fiduciary duty, the same failure to remit retirement contributions, and the same filing of fraudulent information returns. Thus, separate litigation would risk inconsistent results and would be an inefficient use of judicial resources.

53. Accordingly, this means of protecting Rule 23 Plaintiffs' rights is superior to any other method, and this action is properly maintainable as a class action under FRCP 23(b)(3).

## BACKGROUND FACTS

***Allegations Common to All Plaintiffs***

54. At all relevant times, Defendant operated as a back-of-house staffing and services agency for restaurants, providing human resources, payroll services, bookkeeping, and accounts payable services to approximately 80 to 100 restaurant clients throughout the United States.

55. Despite generating revenue from managing the financial operations of dozens of restaurant businesses, Defendant systematically violated federal and state employment laws affecting its entire United States workforce, plus additional employees in Mexico City and India.

56. Defendant systematically misclassified much of its workforce as exempt from overtime.

57. Defendant did this despite its workforce being overworked and underpaid, routinely working over forty hours in a week while performing job duties that at all times fell outside of any applicable FLSA exemption.

58. As a result, Defendant failed to pay them overtime compensation at the rate of one and one-half their regular rates of pay for all hours over forty.

59. Beginning in summer 2024 and continuing through 2025, Defendant's wage payment practices deteriorated into a pattern of chronic late payments, occurring at least once per month with delays extending many days beyond scheduled paydays.

60. Rather than address these systemic payroll failures, Defendant circumvented traditional payroll systems by resorting to alternative payment methods including Zelle, wire

transfers, and PayPal, many of which imposed banking fees on employees that Defendant refused to reimburse.

61. From approximately April or May 2025 forward, Defendant ceased providing employees with pay stubs altogether, explaining to employees that they were "being paid via wire transfer, not via payroll," thereby deliberately evading statutory wage statement requirements.

62. The failure to provide timely and accurate wage statements resulted in concrete injury in fact for all affected employees.

63. Defendant's failure to provide them with timely and accurate wage statements on each pay day left Plaintiffs unaware of whether Defendant was in fact paying them all wages due and owing, or whether Defendant was in fact properly deducting and withhold taxes.

64. Lacking any real documentation from Defendant that showed Plaintiffs' true pay, taxes, and benefits, Plaintiffs were unable to meaningfully advocate for themselves and others due to the lack of accurate information provided to them during each pay period.

65. If Plaintiffs' paystubs accurately reflected the actual wages they were due to receive in a timely manner, actual benefits deductions and contributions, and actual taxes withheld, they would have been made aware that Defendant were paying them improperly and failing to accurately report their wages and taxes to the appropriate federal and state taxing authorities, thereby enabling them to avoid costly and time-consuming medical and health insurance reimbursement, lost investment earnings due to non-contributions to 401(k) accounts, and tax filing and reporting problems caused by Defendant's fraudulent reporting.

66. Indeed, because Plaintiffs never received proper wage statements, Plaintiff waited more than a year before raising their complaints against Defendant, causing them to lose the time-

value of the money they should have earned if they were accurately paid, lost investment earnings, and triggering tax liability due to the underreporting of wages and tax withholdings.

67. Most egregiously, in May 2025, Defendant cancelled employees' group health insurance coverage effective May 31, 2025, without providing any notice to the approximately 15 affected employees, who discovered the termination only through letters received directly from UnitedHealthcare.

68. Despite cancelling coverage, Defendant continued deducting health insurance premiums from employees' wages through at least June 13, 2025, compelling employees to pay for non-existent benefits.

69. This health insurance debacle resulted in substantial out-of-pocket medical expenses for affected employees, including bills exceeding $21,000 for one employee's spouse and over $1,700 for another employee's family medical care.

70. Defendant's ERISA violations extended to retirement benefits, as Defendant deducted 401(k) contributions from employees' wages but failed to remit these contributions to employees' retirement accounts with plan administrators.

71. Defendant also failed to provide promised employer matching contributions despite marketing these benefits to prospective employees, and never implemented Health Savings Account programs despite employee enrollment and deductions.

72. To compound these violations, Defendant filed inaccurate W-2 forms with the IRS and state agencies requiring corrections, misrepresenting income and withholdings related to retirement plan contributions that were deducted but never remitted.

***Facts Relevant to Brian Kidney and All New York Plaintiffs***

73. In November 2023, Defendant hired Plaintiff Kidney as a Client Finance Manager, paid bi-weekly.

74. As Client Finance Manager, Plaintiff Kidney's responsibilities included training new hires on accounting procedures, managing client relationships, and overseeing complex financial implementations in a "split" capacity between implementation teams and serving as a resource for outsourced accountants.

75. Initially, Plaintiff Kidney supervised six employees from India, consisting of two senior accountants and two staff accountants, until Defendant reduced this team beginning in March 2024.

76. Throughout his employment, Plaintiff Kidney typically worked forty hours per week, though he occasionally worked additional hours beyond forty, particularly during his first year of employment before the staffing reductions.

77. Defendant's systematic wage payment violations affecting Plaintiff Kidney began in earnest in February 2024, with the first documented late payment occurring on February 10, 2024, when wages scheduled for February 9, 2024 were paid one day late via Zelle.

78. These late payments escalated significantly throughout 2024 and into 2025, with Plaintiff Kidney experiencing eight separate occasions of untimely wage payments: February 10, 2024 (scheduled February 9); July 29, 2024 (scheduled July 26); September 24, 2024 (scheduled September 20); October 22, 2024 (scheduled October 18); February 10, 2025 (scheduled February 7); February 24, 2025 (scheduled February 21); March 24, 2025 (scheduled March 21); and April 21, 2025 (scheduled April 18).

79. Making matters significantly worse, Defendant circumvented traditional payroll systems by paying Plaintiff Kidney through alternative methods, including ten payments via Zelle between February 2024 and February 2025, which consistently arrived late and without proper pay stubs.

80. Between October 2024 and July 2025, Plaintiff Kidney received seven payments via wire transfer, each imposing a $15 bank fee, with only one fee reimbursed by Defendant, resulting in approximately $90 in unlawful deductions that Defendant never repaid.

81. Beginning in late 2024, Defendant's pay stub delivery became increasingly irregular, with pay stubs for seven consecutive pay periods between November 15, 2024 and February 7, 2025 all delivered together on February 12, 2025, weeks after the corresponding wage payments.

82. Most egregiously, Plaintiff Kidney has not received any pay stub since April 2025, despite receiving multiple wage payments, with Defendant explaining that employees were "being paid via wire transfer, not via payroll."

83. As described above, Plaintiff Kidney's lack of accurate wage statements triggered a concrete injury in fact caused by his lost wages due to unlawful deductions for non-existent benefits, late payment of wages resulting in the loss of time-value of money, and inaccurate tax withholdings and/or unlawful deduction of wages that Defendant purported to remit to federal and state taxing authorities.

84. In May 2025, Defendant cancelled Plaintiff Kidney's health insurance coverage effective May 31, 2025, without providing any notice. Plaintiff Kidney only discovered the cancellation through a termination letter received directly from UnitedHealthcare.

85. Despite cancelling coverage, Defendant continued deducting health insurance premiums from Plaintiff Kidney's wages, including deductions as recently as June 13, 2025, forcing him to pay for non-existent benefits.

86. During the period when his health insurance was cancelled, Plaintiff Kidney personally incurred $1,720.05 in out-of-pocket medical expenses, including $238.80 for prescription medications at CVS and $1,256.25 for specialist visits for his daughter across three separate bills.

87. Defendant's ERISA violations extended beyond health insurance to retirement benefits. Despite Plaintiff Kidney's enrollment in Defendant's 401(k) program, Defendant never implemented these benefits, and no contributions ever appeared on his pay stubs, resulting in lost investment opportunities and tax benefits.

88. Similarly, although Plaintiff Kidney enrolled in Defendant's Health Savings Account program, Defendant failed to implement the HSA, preventing him from accessing tax-advantaged medical savings during the very period when he incurred substantial out-of-pocket medical expenses.

89. Plaintiff Kidney became the first employee to openly complain to Defendant regarding its unlawful cancellation of his and all other employees' health insurance coverage.

90. He repeatedly voiced his concerns about Defendant's failure to reimburse him for his medical expenses, including complaints as recently as the week before his termination.

91. Plaintiff Kidney was also adamantly opposed to Defendant's ongoing failure to provide him and others with paystubs, and the unlawful practice of issuing wage payments via wire transfer and Zelle.

92. On July 18, 2025, shortly after his repeated complaints, Defendant terminated Plaintiff Kidney's employment, claiming his position was being eliminated due to "budget constraints" and characterizing it as a "staff reduction layoff."

93. However, Defendant's stated justification was purely pretextual, as Plaintiff Kidney's was the only position eliminated – no other employees lost their jobs at that time despite the alleged "budget constraints" requiring a "staff reduction."

94. The temporal proximity between Plaintiff Kidney's complaints about Defendant's systematic violations of employment laws and his termination, combined with the fact that only his position was eliminated, demonstrates clear retaliatory intent in violation of federal and state whistleblower protection laws.

***Facts Relevant to Jessica Claycomb, All Pennsylvania Plaintiffs, and All Misclassified FLSA and Pennsylvania Plaintiffs***

95. In March 2020, Defendant's predecessor entity BuyAssociation, LLC hired Plaintiff Claycomb as a Benefits Administrator.

96. Plaintiff Claycomb's initial employment with BuyAssociation was brief, as she was laid off on March 18, 2020, merely six days after her hiring, due to the COVID-19 pandemic's impact on Defendant's restaurant client base.

97. On June 2, 2020, BuyAssociation rehired Plaintiff Claycomb in the position of Benefits and Human Resources Coordinator at the same annual salary, working remotely from her home in Pennsylvania.

98. On August 29, 2021, BuyAssociation acquired Vine Solutions and rebranded as KitchenSync, LLC, with all employees terminated and immediately rehired by the new entity.

99. Effective August 30, 2021, Defendant hired Plaintiff Claycomb as HR & Benefits Administrator, maintaining her same job responsibilities under the restructured company.

100. In her capacity as Benefits and HR Coordinator for Defendant, and later as HR & Benefits Administrator, all of Plaintiff Claycomb's responsibilities were to service and serve Defendant's client restaurants.

101. That is, Plaintiff Claycomb performed no administrative duties or responsibilities for Defendant itself.

102. Rather, Plaintiff Claycomb's duties were always and exclusively to produce the very service that Defendant provided to its customers – namely, administrative support for Defendant's clientele.

103. And even when servicing Defendant's customers, Plaintiff Claycomb never at any times had any discretion or authority relating to Defendant's customer's general business operations, at all times merely supporting Defendant's customers.

104. On October 3, 2022, Defendant increased Plaintiff Claycomb's salary in recognition of her tenure and increased workload.

105. Throughout her employment, Plaintiff Claycomb worked substantial overtime hours, averaging at least fifty hours per week, with some weeks requiring significantly more hours depending on benefit administration deadlines, open enrollment periods, and employee leave management demands.

106. Despite working consistently well in excess of forty hours per week, Defendant classified Plaintiff Claycomb as an overtime-exempt employee and never compensated her at the rate of one and one-half times her regular rate of pay for any hours worked beyond forty in a workweek.

107. In addition to her unpaid overtime, Plaintiff Claycomb suffered direct tangible economic harm due to Defendant's ERISA violations.

108. Specifically, Defendant deducted 401(k) contributions from Plaintiff Claycomb's wages for her last three paychecks but never actually contributed those funds to her Empower retirement account, totaling $618.75 in withheld contributions that Defendant misappropriated.

109. Significantly worse, despite Defendant's March 2022 announcement that the company would provide employer matching contributions for 401(k) accounts, and despite promises that contributions would be processed and matching would occur, Plaintiff Claycomb never received any employer matching contributions for any period of her employment.

110. Beginning in November 2024, Defendant's wage statement violations became particularly egregious with respect to Plaintiff Claycomb, as she did not receive pay stubs for her paychecks dated November 15, 2024, November 29, 2024, or December 13, 2024, receiving only manually-generated pay stubs that were delivered weeks after the corresponding payments.

111. After her resignation, Plaintiff Claycomb repeatedly requested her final pay stubs from Defendant in January 2025, but Defendant failed to provide them, forcing her to follow up multiple times throughout early 2025.

112. Defendant's systematic record-keeping failures extended to tax reporting, as Defendant filed an inaccurate W-2 form for Plaintiff Claycomb's 2024 tax year, requiring a corrected W-2C that was not provided until March 28, 2025, after multiple requests from Plaintiff Claycomb.

113. Notably, the corrected W-2C still contained errors, as it failed to include accurate information regarding state tax withholdings for Plaintiff Claycomb's final three payroll periods that were not processed through the regular Paylocity payroll system.

114. On June 5, 2025, Plaintiff Claycomb sent a formal demand to Defendant regarding both the incomplete corrected W-2 and the missing Empower 401(k) contributions totaling

$618.75 that had been deducted from her final three paychecks but never deposited into her retirement account.

115. Despite Defendant's representations through its Chief of Staff that the 401(k) contribution issue was being resolved, as of the filing of this Complaint, the withheld contributions remain unremitted to Plaintiff Claycomb's retirement account.

116. The intolerable working conditions created by Defendant's systematic wage and benefits violations, combined with the excessive unpaid overtime hours and the company's refusal to properly compensate or maintain basic legal compliance, ultimately forced Plaintiff Claycomb to resign her position effective November 29, 2024.

117. Plaintiff Claycomb's resignation constituted a constructive discharge, as Defendant's ongoing violations of federal and state wage and hour laws, coupled with its misappropriation of her retirement contributions and failure to provide basic wage statements, rendered her continued employment untenable.

***<u>Facts Relevant to Denise Criscella</u>***

118. Plaintiff Criscella was employed by Defendant until February 24, 2025, working remotely from her home in Gibsonia, Pennsylvania.

119. Throughout her employment, Plaintiff Criscella was subject to the same systematic wage and benefits violations that affected Defendant's entire workforce, including chronic late wage payments, improper payroll processing, missing wage statements, and egregious retirement plan mismanagement.

120. Defendant's 401(k) violations affecting Plaintiff Criscella began in April 2024, when Defendant ceased making employer matching contributions to her retirement account,

despite deducting employee contributions from her wages and despite promising such matching contributions as part of the company's benefits package.

121. These retirement plan violations escalated further when, on November 11, 2024, Defendant stopped submitting Plaintiff Criscella's employee 401(k) contributions to Empower, the plan administrator, while continuing to deduct these contributions from her wages.

122. As a result of Defendant's failure to remit both employer matching contributions beginning in April 2024 and employee contributions beginning in November 11, 2024, Plaintiff Criscella suffered estimated damages of close to $1,000 in misappropriated retirement contributions, plus lost investment earnings during the period when these funds should have been invested in her retirement account.

123. In addition to retirement plan violations, Plaintiff Criscella experienced the same pattern of late wage payments that affected all employees, with multiple instances of wages being paid days after their scheduled payday, forcing her to manage personal financial obligations without timely access to her earned compensation.

124. Defendant also issued Plaintiff Criscella incorrect payment amounts on multiple occasions, requiring her to repeatedly contact management to address discrepancies between what she was owed and what she actually received.

125. After learning that her 401(k) contributions had not been properly remitted, Plaintiff Criscella diligently pursued resolution of this issue, communicating with Defendant's management beginning in August 2025 regarding the missing contributions.

126. In August 2025, months after her employment ended, Defendant belatedly deposited $500 in employer matching contributions and $100 in employee contributions into Plaintiff Criscella's 401(k) account, but these transactions mysteriously disappeared shortly

thereafter, with her account reverting to showing the last legitimate transactions as occurring on November 11, 2024.

127. Despite Defendant's representations that the 401(k) contribution issue would be fully resolved by July 11, 2025, as of the filing of this Complaint, Plaintiff Criscella's retirement contributions remain unremitted.

128. As a resident of Pennsylvania who worked remotely from that state throughout her employment, Plaintiff Criscella was subject to and protected by the Pennsylvania Wage Payment and Collection Law, which prohibits the systematic wage payment violations and unlawful deductions that Defendant perpetrated against her.

129. Plaintiff Criscella's experience demonstrates that Defendant's unlawful practices were not isolated incidents but rather company-wide policies affecting all workers regardless of their role, location, or tenure with the company.

***Facts Relevant to Caitlyn MacNeill-Fischer***

130. On April 28, 2023, Defendant hired Plaintiff MacNeill-Fischer as a Customer Service Specialist and Accounts Payable Specialist.

131. In her dual role, Plaintiff MacNeill-Fischer's responsibilities included monitoring two to three email inboxes for the accounting teams, distributing emails to six teams of accountants, making weekly check runs for eight to ten clients, and performing statement reconciliation, invoice retrievals, and responding to customer complaints.

132. Plaintiff MacNeill-Fischer at all times lacked sufficient autonomy, discretion, or independent judgment to be classified as an exempt administrative employee, as she was at all times performing wrote, systematized tasks, data entry, or courier-related tasks.

133. Throughout her employment, Plaintiff MacNeill-Fischer consistently worked between forty and forty-five hours per week, electronically clocking in and out through Defendant's timekeeping system, which recorded all hours worked in excess of forty hours per week.

134. Despite working consistently over forty hours per week as documented in Defendant's own electronic timekeeping records, Defendant has never compensated her at the rate of one and one-half times her regular rate of pay for any hours worked beyond forty in a workweek.

135. From the commencement of her employment through November 2024, Plaintiff MacNeill-Fischer worked from Defendant's Los Angeles office, reporting in person as required by company policy for employees residing within one hour of an office location.

136. In November 2024, Plaintiff MacNeill-Fischer relocated from Los Angeles to Jersey City, New Jersey, and has worked remotely from her New Jersey residence since that time, establishing her connection to New Jersey jurisdiction and subjecting her employment to the protections of the New Jersey Wage Payment Law.

137. As a New Jersey employee, Plaintiff MacNeill-Fischer experienced the same systematic late wage payments affecting Defendant's entire workforce, with wages paid late at least once per month with delays extending at least four days beyond scheduled paydays.

138. Beginning in May 2025, Defendant ceased providing Plaintiff MacNeill-Fischer with pay stubs, instead directly wiring money to her bank account without proper wage statements documenting hours worked, deductions, or other required information.

139. Most catastrophically, in May 2025, Defendant cancelled Plaintiff MacNeill-Fischer's health insurance coverage effective May 31, 2025, without providing any notice to her or her covered dependents.

140. Plaintiff MacNeill-Fischer only learned of the insurance cancellation when she received a termination letter directly from UnitedHealthcare stating that her coverage had been terminated effective May 31, 2025.

141. Despite cancelling Plaintiff MacNeill-Fischer's health insurance coverage, Defendant continued deducting health insurance premiums from her wages, with deductions continuing through at least June 13, 2025, forcing her to pay for non-existent coverage.

142. The devastating consequences of Defendant's insurance cancellation became immediately apparent when Plaintiff MacNeill-Fischer's spouse, who was covered under her health plan, required medical care during the period when their insurance had been secretly cancelled.

143. As a direct result of Defendant's cancellation of health insurance without notice, Plaintiff MacNeill-Fischer's spouse incurred a substantial medical bill totaling $21,085.25.

144. This $21,085.25 medical expense represents medical care that would have been covered had Defendant maintained the health insurance coverage for which Plaintiff MacNeill-Fischer had enrolled, paid premiums, and relied upon for her family's healthcare needs.

145. Making matters worse, even after Plaintiff MacNeill-Fischer and her spouse discovered the insurance cancellation and began demanding answers from Defendant, Defendant continued deducting health insurance premiums from Plaintiff MacNeill-Fischer's wages through June 13, 2025, fraudulently collecting money for coverage that no longer existed.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANT

*Unpaid Overtime in Violation of the FLSA*
*(On Behalf of Plaintiffs and FLSA Plaintiffs)*

146. Plaintiffs and FLSA Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

147. 29 U.S.C. § 207(a) requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked exceeding forty in a workweek.

148. As described above, Defendant is an "employer" within the meaning of the FLSA, while Plaintiffs and FLSA Plaintiffs are "employees" within the meaning of the FLSA.

149. Plaintiffs and FLSA Plaintiffs worked in excess of forty hours per week, yet Defendant failed to compensate Plaintiffs and FLSA Plaintiffs in accordance with the FLSA's overtime provisions. Specifically, Plaintiff Claycomb regularly worked at least fifty hours per week on average, with some weeks requiring significantly more hours, yet received no overtime compensation. Plaintiff MacNeill-Fischer consistently worked forty to forty-five hours per week without receiving overtime pay. Plaintiff Kidney worked in excess of forty hours per week on multiple occasions, particularly during his first year of employment, without overtime compensation.

150. Defendant willfully violated the FLSA, in that Defendant knew of its obligations under federal wage and hour law, systematically failed to pay overtime compensation despite maintaining electronic timekeeping records documenting hours worked in excess of forty per week, and continued these violations even after employees complained about wage and hour irregularities.

151. Plaintiffs and FLSA Plaintiffs are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their respective regular rates of pay.

152. Plaintiffs and FLSA Plaintiffs are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendant's violations of the FLSA's overtime provisions.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANT**

*Failure to Make Prompt Payment of Wages in Violation of the FLSA*

*(On Behalf of Plaintiffs and FLSA Plaintiffs)*

153. Plaintiffs and FLSA Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

154. 29 U.S.C. § 206 and supporting regulations require employers to pay wages to employees on regular paydays and in a timely manner.

155. As described above, Defendant is an "employer" within the meaning of the FLSA, while Plaintiffs and FLSA Plaintiffs are "employees" within the meaning of the FLSA.

156. Defendant systematically failed to pay Plaintiffs and FLSA Plaintiffs their wages on regular paydays, instead repeatedly paying wages late and through alternative payment methods that circumvented traditional payroll systems. Specifically, Defendant paid wages late at least once per month with delays extending four or more days beyond scheduled paydays. Plaintiff Kidney experienced eight separate late payments between February 2024 and April 2025, with wages delivered via Zelle on ten occasions and via wire transfer on seven occasions. These alternative payment methods often arrived without proper wage statements and imposed banking fees on employees.

157. Defendant willfully violated the FLSA's prompt payment requirements, in that Defendant knew wages were due on scheduled paydays, systematically paid wages late through alternative methods including Zelle and wire transfers rather than maintaining regular payroll practices, and continued these violations even after employees complained about late wage payments and improper payment methods.

158. Plaintiffs and FLSA Plaintiffs are entitled to damages for Defendant's failure to make prompt payment of wages.

159. Plaintiffs and FLSA Plaintiffs are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendant's violations of the FLSA's prompt payment requirements.

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANT**
*Unpaid Overtime in Violation of the Pennsylvania Wage Payment and Collection Law*
*(On Behalf of Jessica Claycomb and Denise Criscella)*

160. Plaintiffs Claycomb and Criscella repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

161. The Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq., requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked exceeding forty in a workweek.

162. Defendant is an "employer" within the meaning of the Pennsylvania Wage Payment and Collection Law, while Plaintiffs Claycomb and Criscella are "employees" within the meaning of the Pennsylvania Wage Payment and Collection Law, as both worked remotely from their Pennsylvania residences throughout their employment.

163. Plaintiffs Claycomb and Criscella worked in excess of forty hours in a workweek, yet Defendant failed to compensate them in accordance with Pennsylvania law. Specifically, Plaintiff Claycomb regularly worked at least fifty hours per week on average, with some weeks requiring significantly more hours, yet received no overtime compensation. Plaintiff Criscella similarly worked in excess of forty hours per week without receiving the required overtime rate.

164. Plaintiffs Claycomb and Criscella are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their regular rate of pay.

165. Plaintiffs Claycomb and Criscella are also entitled to treble damages, liquidated damages, interest, attorneys' fees, and costs for Defendant's violations of the Pennsylvania Wage Payment and Collection Law's overtime provisions.

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT**

*Unlawful Deductions in Violation of the Pennsylvania Wage Payment and Collection Law*
*(On Behalf of Jessica Claycomb and Denise Criscella)*

166. Plaintiffs Claycomb and Criscella repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

167. The Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq., prohibits employers from making unlawful deductions from employees' wages.

168. Defendant is an "employer" within the meaning of the Pennsylvania Wage Payment and Collection Law, while Plaintiffs Claycomb and Criscella are "employees" within the meaning of the Pennsylvania Wage Payment and Collection Law.

169. Defendant made improper deductions from Plaintiffs Claycomb's and Criscella's wages in violation of Pennsylvania law. Specifically, Defendant deducted 401(k) contributions totaling $618.75 from Plaintiff Claycomb's last three paychecks but never remitted those funds to her retirement account. Defendant similarly deducted employee 401(k) contributions from Plaintiff Criscella's wages beginning in April 2024 but ceased submitting these contributions to the plan administrator on November 11, 2024, while continuing to deduct them from her wages. Additionally, Defendant continued deducting health insurance premiums from Plaintiffs' wages after cancelling their coverage effective May 31, 2025.

170. Plaintiffs Claycomb and Criscella are entitled to recover all unlawfully deducted amounts.

171. Plaintiffs Claycomb and Criscella are also entitled to treble damages, liquidated damages, interest, attorneys' fees, and costs for Defendant's violations of the Pennsylvania Wage Payment and Collection Law's prohibition against unlawful deductions.

**FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT**

*Failure to Provide Accurate Wage Statements on Each Pay Day in Violation of the NYLL*
*(On Behalf of Brian Kidney)*

172. Plaintiff Kidney repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

173. N.Y. Lab. Law § 195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria on each occasion when the employer pays wages to the employee, including dates of work covered by the payment, rate or rates of pay, gross wages, deductions, allowances claimed as part of the minimum wage, and net wages.

174. Defendant is an "employer" within the meaning of the NYLL, while Plaintiff Kidney is an "employee" within the meaning of the NYLL, as he worked from his New York residence throughout his employment.

175. As described above, Defendant, on each payday, failed to furnish Plaintiff Kidney with accurate wage statements containing the criteria required under NYLL § 195(3). Specifically, beginning in approximately April or May 2025, Defendant ceased providing pay stubs altogether, claiming employees were "being paid via wire transfer, not via payroll." For Plaintiff Kidney, pay stubs for seven consecutive pay periods between November 15, 2024 and February 7, 2025 were all delivered together on February 12, 2025, weeks after the corresponding payments, and he received no pay stubs whatsoever after April 2025.

176. These violations were particularly egregious because Defendant simultaneously switched to alternative payment methods including Zelle and wire transfers while abandoning its obligation to provide the wage statements required under New York's Wage Theft Prevention Act,

deliberately obscuring from employees the calculations underlying their compensation and deductions.

177. Pursuant to NYLL § 198(1-d), Defendant is liable to Plaintiffs Kidney in the amount of $250.00 for each workday that the violations occurred, up to a statutory cap of $5,000.00.

**SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT**
*Unlawful Deductions in Violation of the NYLL*
*(On Behalf of Brian Kidney)*

178. Plaintiff Kidney repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

179. NYLL § 193 prohibits employers from making any deduction from an employee's wages, outside of certain limited enumerated circumstances that do not apply here.

180. As described above, Defendant is an "employer" within the meaning of the NYLL, while Plaintiff Kidney is an "employee" within the meaning of the NYLL.

181. Defendant made unlawful deductions from Plaintiffs Kidney's wages in violation of NYLL § 193. Specifically, Defendant continued deducting health insurance premiums from Plaintiff's wages after cancelling their health insurance coverage effective May 31, 2025, including deductions as recent as June 13, 2025 for Plaintiff Kidney. Additionally, Defendant deducted $15 wire transfer banking fees from Plaintiff Kidney's wages on seven separate occasions, with only one fee reimbursed, resulting in approximately $90 in unlawful deductions that Defendant refused to repay despite Plaintiff Kidney's requests for reimbursement.

182. To the extent Defendant instructed employees to seek medical care reimbursement directly through UnitedHealthcare after the insurance cancellation, this amounts to a further unlawful deduction by separate transaction in violation of NYLL § 193, as employees were forced

to bear out-of-pocket medical expenses for care that would have been covered had Defendant maintained the insurance coverage for which premiums were being deducted.

183. As a result, Defendant is liable to Plaintiff Kidney for the amount of each unlawful deduction, including the continued collection of health insurance premiums after coverage cancellation, unreimbursed banking fees, and constructive deductions represented by medical expenses employees incurred during the insurance coverage gap.

184. Plaintiff Kidney is also entitled to liquidated damages up to 100% of the unlawfully deducted amounts, interest, and attorneys' fees for Defendant's violations of the NYLL's unlawful deduction provision.

**SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT**
*Failure to Make Timely Payment of Wages in Violation of the New Jersey Wage Payment Law*
*(On Behalf of Caitlyn MacNeill-Fischer Only)*

185. Plaintiff MacNeill-Fischer repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

186. The New Jersey Wage Payment Law, N.J.S.A. § 34:11-4.1 et seq., requires employers to pay wages to employees on regular paydays designated in advance by the employer. N.J.S.A. § 34:11-4.4 specifically requires that "Every employer shall pay the full amount of wages due to his employees at least twice during each calendar month, on regular paydays designated in advance by the employer." The statute prohibits the type of irregular, delayed payments through alternative methods that Defendant systematically employed, as such practices undermine employees' ability to rely on receiving earned compensation when expected and deprive them of the time-value of their money.

187. Defendant is an "employer" within the meaning of the New Jersey Wage Payment Law, while Plaintiff MacNeill-Fischer is an "employee" within the meaning of the New Jersey

Wage Payment Law, as she has worked remotely from her residence in Jersey City, New Jersey since November 2024, establishing her employment relationship's connection to New Jersey jurisdiction and subjecting her wages to the protections of New Jersey employment law.

188. Defendant systematically failed to pay Plaintiff MacNeill-Fischer her wages on regular, designated paydays in accordance with New Jersey law. Specifically, Defendant paid Plaintiff MacNeill-Fischer's wages late at least once per month, with delays extending at least four days beyond scheduled paydays. These violations were not isolated incidents but rather a systematic pattern affecting Plaintiff MacNeill-Fischer throughout the period she worked from New Jersey. Making matters worse, beginning in May 2025, Defendant ceased providing Plaintiff MacNeill-Fischer with pay stubs altogether, instead paying her through direct wire transfers without proper wage documentation, further obscuring when wages were actually due and when they were belatedly paid.

189. As a direct result of Defendant's systematic failure to pay wages timely, Plaintiff MacNeill-Fischer suffered concrete harm, including the inability to timely pay her bills and meet financial obligations when her earned wages did not arrive on scheduled paydays, and the loss of the time-value of money as her wages sat in Defendant's accounts earning value for Defendant rather than being available to Plaintiff MacNeill-Fischer when legally due. This harm was particularly acute and devastating given the concurrent crisis created by Defendant's cancellation of her health insurance coverage, which left her family facing a catastrophic $21,085.25 medical bill – making timely access to her earned wages even more critical for managing this financial emergency that Defendant's own misconduct had created.

190. Plaintiff MacNeill-Fischer is entitled to recover all wages that were paid late, calculated from the scheduled payday through the date payment was actually received, representing the time-value of money that Defendant wrongfully retained.

191. Plaintiff MacNeill-Fischer is also entitled to liquidated damages potentially up to double the amount of unpaid or late-paid wages, interest, attorneys' fees, and costs for Defendant's violations of the New Jersey Wage Payment Law. New Jersey law provides these substantial remedies precisely to deter employers from engaging in the type of systematic wage payment delays that Defendant perpetrated against Plaintiff MacNeill-Fischer, recognizing that employees depend on receiving their wages when promised and suffer real harm when employers fail to meet this fundamental legal obligation.

## EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANT

*Breach of Fiduciary Duty in Violation of ERISA*
*(On Behalf of Rule 23 Plaintiffs)*

192. Plaintiffs and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

193. The Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., establishes comprehensive federal standards governing the administration of employee benefit plans and imposes stringent fiduciary duties on those who manage such plans.

194. At all relevant times, Defendant maintained and administered employee benefit plans within the meaning of ERISA, including: (a) a group health insurance plan providing medical coverage through UnitedHealthcare; (b) a 401(k) retirement plan administered through Empower and previously through TransAmerica; and (c) a Health Savings Account program. These plans constitute "employee benefit plans" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and are subject to ERISA's comprehensive regulatory framework.

195. Defendant acted as a fiduciary with respect to these employee benefit plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that Defendant: (a) exercised discretionary authority or control over management of the plans; (b) exercised authority or control over disposition of plan assets, including employee contributions withheld from wages and employer matching contributions; (c) had discretionary authority or responsibility in the administration of the plans; and (d) determined which employees would be enrolled, what benefits would be provided, and when contributions would be remitted to plan accounts.

196. As a fiduciary, Defendant owed the highest duties of loyalty and care to plan participants and beneficiaries, as mandated by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), which requires fiduciaries to discharge their duties: (a) solely in the interest of the participants and beneficiaries; (b) for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan; (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (d) in accordance with the documents and instruments governing the plan; and (e) by diversifying plan investments so as to minimize the risk of large losses.

197. Defendant systematically and egregiously breached its fiduciary duties under ERISA in multiple respects, causing catastrophic harm to plan participants and their families.

198. First, Defendant breached its fiduciary duty by failing to remit employee 401(k) contributions that were deducted from employees' wages to the retirement plan accounts. Specifically, Defendant deducted $618.75 from Plaintiff Claycomb's final three paychecks for 401(k) contributions but never deposited these funds into her Empower retirement account. Defendant similarly deducted employee contributions from Plaintiff Criscella's wages beginning

in April 2024 but ceased submitting these contributions to the plan administrator on November 11, 2024, while continuing to deduct them from her paychecks. Defendant engaged in the same pattern of deducting contributions from other employees' wages while pocketing those funds rather than remitting them to participants' retirement accounts.

199. Second, Defendant breached its fiduciary duty by failing to make promised employer matching contributions to employees' 401(k) accounts despite representing to employees that such matching would be provided. In March 2022, Defendant announced that the company would provide employer matching contributions, and employees relied on these promises in making their own contribution decisions. However, Defendant ceased making employer matching contributions beginning in April 2024 for Plaintiff Criscella and failed to provide any employer matching contributions to Plaintiff Claycomb or other employees for any period, despite continuing to withhold employee contributions and despite plan documents promising such matching.

200. Third, Defendant breached its fiduciary duty by cancelling employees' group health insurance coverage effective May 31, 2025, without providing any notice to approximately fifteen plan participants, who discovered the termination only through letters received directly from UnitedHealthcare. This secret cancellation violated Defendant's obligation to administer the plan in accordance with its terms and to act solely in participants' interests.

201. Fourth, compounding the health insurance cancellation, Defendant breached its fiduciary duty by continuing to deduct health insurance premiums from employees' wages through at least June 13, 2025, despite having cancelled the coverage effective May 31, 2025. These ongoing premium deductions constituted a brazen misappropriation of plan assets, as Defendant collected money designated for employee benefits while providing no benefits in return, using

employees' funds for Defendant's own benefit rather than for the exclusive purpose of providing benefits to plan participants.

202. Fifth, Defendant breached its fiduciary duty by failing to implement Health Savings Account programs despite enrolling employees in such programs and, in some cases, deducting HSA contributions from employees' wages. This failure deprived employees of tax-advantaged medical savings opportunities during the very period when Defendant's cancellation of health insurance left them facing substantial out-of-pocket medical expenses.

203. Sixth, Defendant failed to prudently manage plan assets by allowing retirement contributions to sit in Defendant's general accounts rather than being promptly remitted to participants' individual retirement accounts, depriving employees of investment earnings during the period when Defendant wrongfully retained their contributions.

204. Defendant's fiduciary breaches were not isolated mistakes but rather constituted a systematic pattern of self-dealing and misappropriation, using employee benefit contributions as unauthorized loans to fund Defendant's operations while the company struggled with client attrition and financial instability, all in direct violation of ERISA § 406's prohibited transaction rules, 29 U.S.C. § 1106.

205. As a direct and proximate result of Defendant's breaches of fiduciary duty, plan participants and their families suffered devastating harm. Plaintiff MacNeill-Fischer's family incurred $21,085.25 in out-of-pocket medical expenses when her spouse required care during the period when Defendant had secretly cancelled their health insurance. Plaintiff Kidney incurred $1,720.05 in medical expenses, including $238.80 for prescriptions and $1,256.25 for his daughter's specialist visits. Plaintiffs Claycomb and Criscella lost retirement contributions and investment earnings when Defendant misappropriated funds deducted from their wages. All plan

participants suffered the loss of investment opportunities, compound earnings, and tax benefits that would have accrued had Defendant properly administered the retirement plans.

206. Pursuant to ERISA § 409, 29 U.S.C. § 1109, Defendant is personally liable to make good to the plans any losses resulting from its breaches of fiduciary duty and to restore to the plans any profits Defendant made through use of plan assets.

207. Plaintiffs and Rule 23 Plaintiffs are entitled to all appropriate equitable relief to remedy Defendant's fiduciary breaches, including but not limited to: (a) make-whole relief restoring all participants to the position they would have occupied had Defendant fulfilled its fiduciary obligations; (b) restoration of all losses to the plans, including lost investment earnings calculated from the date contributions should have been deposited through the present; (c) reimbursement of all out-of-pocket medical expenses incurred by participants during the period when Defendant cancelled health insurance coverage; (d) refund of all premiums deducted after coverage was cancelled; (e) equitable restitution of all misappropriated plan assets; (f) removal of Defendant as fiduciary; (g) imposition of a constructive trust over any plan assets Defendant wrongfully retains; and (h) such other equitable or remedial relief as the Court deems just and proper.

208. Pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), Plaintiffs and Rule 23 Plaintiffs are entitled to reasonable attorneys' fees and costs incurred in prosecuting this action.

## NINTH CLAIM FOR RELIEF AGAINST DEFENDANT

*Failure to Make Plan Contributions in Violation of ERISA*

*(On Behalf of Rule 23 Plaintiffs)*

209. Plaintiffs and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

210. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides plan participants with a cause of action to obtain appropriate equitable relief to redress violations of ERISA or the terms of the plan, including violations consisting of an employer's failure to remit required contributions to employee benefit plans.

211. As described above, Defendant maintained employee benefit plans within the meaning of ERISA, including a 401(k) retirement plan and Health Savings Account program, and was obligated under the terms of those plans and pursuant to employee enrollment elections to: (a) remit employee contributions that were withheld from participants' wages to their individual retirement accounts; and (b) make employer matching contributions in accordance with plan documents and representations made to employees.

212. The governing plan documents, including the UHG Inc. Group Benefits Plan and related amendments, the Empower retirement plan documentation, and Defendant's representations to employees through benefit enrollment materials and announcements, established Defendant's obligation to timely remit all employee contributions and to provide employer matching contributions as promised.

213. Defendant systematically violated its obligation to make required plan contributions in multiple respects, causing substantial harm to plan participants and the retirement plan itself.

214. First, Defendant failed to remit employee 401(k) contributions that were deducted from participants' wages to the retirement plan. Specifically, contributions totaling $618.75 were deducted from Plaintiff Claycomb's final three paychecks but never deposited into her Empower account. Employee contributions were deducted from Plaintiff Criscella's wages beginning in April 2024, but Defendant ceased submitting these contributions to Empower on November 11,

2024, while continuing to withhold them from her paychecks. The same pattern of deducting contributions without remitting them to the plan affected other employees throughout Defendant's workforce.

215. Second, Defendant failed to make employer matching contributions despite promising such contributions as part of the retirement plan benefits and despite employees' reliance on these promises in making their own contribution decisions. In March 2022, Defendant announced through company-wide communications that employer matching would be provided for 401(k) contributions. However, Defendant ceased making any employer matching contributions beginning in April 2024 for Plaintiff Criscella, and failed to provide any employer matching contributions to Plaintiff Claycomb or numerous other employees for any period of their participation in the plan.

216. Third, Defendant failed to implement Health Savings Account contributions despite enrolling employees in HSA programs and representing that such accounts would be established and funded.

217. The amounts of Defendant's failure to make required plan contributions include, but are not limited to: (a) $618.75 in unremitted employee contributions for Plaintiff Claycomb; (b) estimated damages under $1,000 for Plaintiff Criscella representing unremitted employee contributions and unpaid employer matching from April 2024 forward; and (c) similar amounts for all other plan participants whose contributions were deducted but not deposited and who were denied promised employer matching contributions.

218. As a direct and proximate result of Defendant's failure to make required plan contributions, Plaintiffs and Rule 23 Plaintiffs suffered substantial harm to their retirement security and lost the opportunity for investment growth that would have accrued had their contributions

been timely deposited into their accounts. The investment earnings lost during the period when Defendant wrongfully retained participants' contributions – when financial markets experienced significant growth – represent permanent, irreversible harm that compounds over time through the loss of compound returns.

219. The retirement plan itself suffered harm through Defendant's systematic failure to receive required contributions, depriving the plan of assets that should have been invested for participants' benefit and undermining the plan's fundamental purpose of providing retirement security.

220. Defendant's violations were knowing and willful, as Defendant deliberately deducted contributions from employees' wages while making conscious decisions not to remit those contributions to the plan, instead using employees' retirement funds to subsidize Defendant's operations during a period of financial instability and client attrition.

221. Plaintiffs and Rule 23 Plaintiffs are entitled to appropriate relief for Defendant's failure to make required plan contributions, including but not limited to: (a) an order requiring Defendant to immediately remit all employee contributions that were deducted from wages but never deposited into participants' accounts; (b) an order requiring Defendant to make all promised employer matching contributions for all periods; (c) payment of lost investment earnings calculated from the date each contribution should have been deposited through the date of actual payment, using appropriate benchmarks reflecting the investment performance the contributions would have achieved had they been timely invested; (d) interest on all amounts owed; (e) statutory penalties available under ERISA for failure to make required contributions; and (f) such other relief as the Court deems just and appropriate to make participants whole.

222. Pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), Plaintiffs and Rule 23 Plaintiffs are entitled to reasonable attorneys' fees and costs incurred in prosecuting this action to recover the contributions Defendant wrongfully withheld from the plan.

**TENTH CLAIM FOR RELIEF AGAINST DEFENDANT**
*Unlawful Filing of Fraudulent Information Returns in Violation of 26 U.S.C. § 7434(a)*
*(On Behalf of Rule 23 Plaintiffs)*

223. Plaintiffs and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

224. 26 U.S.C. § 7434(a) prohibits any person from willfully filing a fraudulent information return with respect to payments purported to be made to any other person. This statute provides a private right of action for individuals harmed by the filing of fraudulent W-2 forms, 1099 forms, or other information returns filed with the Internal Revenue Service.

225. As described above, Defendant filed or caused to be filed fraudulent W-2 forms and other information returns with the Internal Revenue Service on behalf of Plaintiffs and Rule 23 Plaintiffs, on an annual basis during the applicable limitations period.

226. Specifically, Defendant's fraudulent information returns contained materially false information in multiple respects. First, Defendant reported 401(k) retirement plan contributions on employees' W-2 forms as having been withheld and deposited when in fact Defendant never remitted these contributions to employees' retirement accounts, including $618.75 in fraudulently reported contributions for Plaintiff Claycomb and similar amounts for other class members. Second, Defendant underreported wages and incorrectly stated withholdings on W-2 forms, requiring correction through amended W-2C forms for multiple employees including Plaintiff Claycomb, with some corrected forms still containing errors regarding state tax withholdings and final payroll periods processed outside regular payroll systems.

227. Defendant knowingly and willfully filed these fraudulent information returns with the Internal Revenue Service, in that Defendant knew when filing the W-2 forms that: (a) 401(k) contributions reported as withheld and deposited had never been remitted to employees' retirement accounts; (b) actual wages paid to employees differed from the amounts reported on the information returns; (c) withholdings for retirement contributions and other benefits reported on W-2 forms were inaccurate; and (d) the information returns contained materially false statements regarding employees' compensation and benefits.

228. As a direct and proximate result of Defendant's willful filing of fraudulent information returns, Plaintiffs and Rule 23 Plaintiffs have suffered and continue to suffer substantial harm, including potential IRS inquiries or audits arising from discrepancies between Defendant's fraudulent information returns and employees' actual tax positions, costs attributable to obtaining corrected W-2C forms and resolving tax reporting deficiencies, harm to credit and financial standing from unresolved tax issues, and the time and expense required to correct Defendant's fraudulent filings.

229. Pursuant to 26 U.S.C. § 7434(a), Plaintiffs and Rule 23 Plaintiffs are entitled to recover damages in an amount equal to the greater of $5,000.00 per fraudulent information return filed, or the sum of any actual damages sustained as a proximate result of Defendant's filing of fraudulent information returns, including any costs attributable to resolving deficiencies asserted as a result of such filing.

230. Plaintiffs and Rule 23 Plaintiffs are also entitled to recover the costs of this action and, in the Court's discretion, reasonable attorneys' fees pursuant to 26 U.S.C. § 7434(c).

231. Pursuant to 26 U.S.C. § 7434(d), contemporaneous with the filing of this Complaint, Plaintiffs are providing a copy of this Complaint to the Internal Revenue Service.

**ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT**

*Violations of the Whistleblower Protection Provision under NYLL § 740*
*(On Behalf of Plaintiff Brian Kidney Only)*

232. Plaintiff Kidney repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

233. New York Labor Law § 740 prohibits employers from taking retaliatory action against an employee because such employee discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety.

234. Defendant is an "employer" within the meaning of NYLL § 740, while Plaintiff Kidney is Defendant's "employee" within the meaning of NYLL § 740.

235. As set forth above, Defendant retaliated against Plaintiff Kidney for engaging in protected activity under NYLL § 740.

236. Specifically, Plaintiff Kidney became the first employee to openly complain to Defendant regarding its unlawful cancellation of health insurance coverage affecting approximately fifteen employees, creating a substantial and specific danger to public health and safety by depriving workers and their families of medical coverage while Defendant fraudulently continued collecting premiums. Plaintiff Kidney repeatedly voiced his concerns about Defendant's failure to reimburse him for $1,720.05 in out-of-pocket medical expenses, including complaints as recently as the week before his termination. Plaintiff Kidney was also adamantly opposed to Defendant's systematic wage payment violations, including the ongoing failure to provide employees with paystubs and the unlawful practice of issuing wage payments via wire transfer and

Zelle. Additionally, Plaintiff Kidney complained about Defendant's misappropriation of 401(k) contributions and filing of fraudulent tax information returns affecting the entire workforce.

237. These disclosures involved violations creating substantial and specific dangers to public health and safety, including health insurance fraud affecting fifteen employees and their families who faced potential denial of necessary medical care; retirement plan theft depriving workers of financial security in violation of ERISA; and tax fraud through filing of fraudulent information returns with the Internal Revenue Service.

238. On July 18, 2025, shortly after Plaintiff Kidney's repeated complaints about these systematic violations, Defendant terminated his employment, claiming his position was being eliminated due to "budget constraints" and characterizing it as a "staff reduction layoff."

239. However, Defendant's stated justification was purely pretextual, as Plaintiff Kidney's was the only position eliminated – no other employees lost their jobs despite the alleged "budget constraints" requiring a "staff reduction."

240. The temporal proximity between Plaintiff Kidney's protected disclosures and his termination, combined with the pretextual nature of Defendant's stated justification, evidences Defendant's retaliatory motive and demonstrates Defendant's willingness to silence whistleblowers who expose violations threatening public health and safety.

241. Defendant's retaliatory actions against Plaintiff Kidney violated NYLL § 740.

242. As a direct and proximate result of Defendant's conduct in violation of NYLL § 740, Plaintiff Kidney has suffered, and continues to suffer, substantial damages including, but not limited to, lost past and future wages, lost benefits including health insurance and retirement contributions, emotional distress, front pay, and reputational harm in his profession.

243. Pursuant to NYLL § 740, Plaintiff Kidney is entitled to substantial remedies including reinstatement, back pay, front pay, damages for emotional distress, reasonable attorneys' fees, and costs of this action.

**DEMAND FOR A JURY TRIAL**

244. Pursuant to FRCP 38(b), Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs demand a trial by jury in this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Brian Kidney, Jessica Claycomb, Denise Criscella, Caitlyn MacNeill-Fischer, FLSA Plaintiffs, and Rule 23 Plaintiffs respectfully demand judgment against Defendant as follows:

a. A judgment declaring that the practices complained of herein are unlawful and in violation of the Fair Labor Standards Act, the Employee Retirement Income Security Act, the Internal Revenue Code, the New York Labor Law, the Pennsylvania Wage Payment and Collection Law, the New Jersey Wage Payment Law, and all other aforementioned laws;

b. Preliminary and permanent injunctions against Defendant, and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with the Defendant, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c. An order restraining Defendant from any retaliation against Plaintiffs Kidney, Claycomb, Criscella, MacNeill-Fischer, FLSA Plaintiffs, and/or Rule 23 Plaintiffs for participation in any form in this litigation;

d. Designation of this action as an FLSA collective action on behalf of Plaintiffs and FLSA Plaintiffs and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to the FLSA

Plaintiffs, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations;

e. Certification of the claims brought in this case as a class action pursuant to FRCP 23(b)(3);

f. Designation of Plaintiffs and their counsel as class/collective action representatives under the FRCP and the FLSA;

g. An award of damages for all unpaid overtime compensation due and owing to Plaintiffs and similarly situated employees under the FLSA, New York Labor Law, and Pennsylvania Wage Payment and Collection Law, plus liquidated damages equal to the amount of unpaid wages under the FLSA and up to 100% under the NYLL, interest, and attorneys' fees and costs as provided for under applicable law;

h. An award of damages for all untimely wage payments in violation of the FLSA, New York Labor Law, and New Jersey Wage Payment Law, plus liquidated damages, statutory penalties, interest, and attorneys' fees and costs;

i. An award for failure to provide accurate wage notices upon hire as required by NYLL § 195(1), in the amount of $50.00 for each workday the violations occurred, up to the statutory cap of $5,000.00;

j. An award for failure to provide accurate wage statements on each payday as required by NYLL § 195(3), in the amount of $250.00 for each workday the violations occurred, up to the statutory cap of $5,000.00;

k. An award of damages for all unlawful deductions in violation of the NYLL, Pennsylvania Wage Payment and Collection Law, including continued health insurance premium

deductions after coverage cancellation, unreimbursed banking fees, and 401(k) contributions deducted but not remitted, plus liquidated damages, treble damages where applicable, interest, and attorneys' fees and costs;

l. Make-whole relief for all ERISA violations, including restoration of all 401(k) contributions deducted from wages but not remitted to retirement accounts, all employer matching contributions promised but not paid, lost investment earnings from the date contributions should have been deposited through the present, reimbursement of all out-of-pocket medical expenses incurred during the period health insurance was cancelled, refund of all health insurance premiums deducted after coverage cancellation, and all other equitable relief necessary to restore Plaintiffs and class members to the position they would have occupied had Defendant fulfilled its fiduciary obligations under ERISA;

m. An award of statutory damages under 26 U.S.C. § 7434(a) in an amount equal to the greater of $5,000.00 per fraudulent information return filed, or the sum of any actual damages sustained as a proximate result of Defendant's filing of fraudulent W-2 forms and other information returns, including costs attributable to resolving tax deficiencies;

n. An award of damages for Defendant's retaliatory termination of Plaintiff Kidney in violation of NYLL § 740, including back pay, front pay, damages for emotional distress, harm to professional reputation, lost benefits, and all other damages as provided under New York law;

o. An award of all compensatory damages including but not limited to out-of-pocket medical expenses, banking fees for wire transfers, FSA losses, costs of obtaining insurance coverage, and all other pecuniary losses sustained by Plaintiffs and class members as a result of Defendant's unlawful conduct;

p. Pre-judgment and post-judgment interest, as provided by law;

q. An award to Plaintiffs for all costs and disbursements of this action, including reasonable attorneys' fees, expert fees, and other costs as provided under the FLSA, ERISA, Internal Revenue Code, NYLL, Pennsylvania Wage Payment and Collection Law, New Jersey Wage Payment Law, and all other applicable statutes; and

r. Granting Plaintiffs, FLSA Plaintiffs, and Rule 23 Plaintiffs such other and further relief as this Court finds necessary and proper.

Dated: New York, New York
May 21, 2026

Respectfully submitted,

**STEVENSON MARINO LLP**

By: ______________________

Michael R. Minkoff, Esq.
2000 Deer Park Ave.
Deer Park, NY 11729
Tel.: (212) 939-7231
Fax: (212) 531-6129
*Attorneys for Plaintiffs and Putative Collective and Class*